J. Scott SEAWRIGHT, Plaintiff,

v.

CHARTER FURNITURE RENTAL, INC., Defendant.

No. 3:97–CV–2346–X.

United States District Court,
N.D. Texas,
Dallas Division.

March 24, 1999.

Janette Johnson, Kurt Compton Banow-sky, Christine, Neill, Huffman, Janette Johnson & Associates, Dallas, TX, for plaintiff.

Kelly M. Crawford, Scheef & Stone, Dallas, TX, for defendant.

## MEMORANDUM OPINION AND ORDER

KENDALL, District Judge.

Before the Court are: 1) Defendant's Motion for Award of Attorneys' Fees and Expenses, filed July 17, 1998; Plaintiff's Response, filed August 20, 1998; and Defendant's Reply, filed September 1, 1998; and 2) Defendant's Motion to Recover Attorneys' Fees and Expenses From Plaintiff's Counsel, filed September 1, 1998;[1] Plaintiff's Response, filed August 17, 1998; and Defendant's Reply, filed September 1,

---

1. Defendant first raised the issue that Plaintiff's lawyers should be held liable for Defendant's attorneys' fees and expenses in Defendant's July 17, 1998 motion in which Defendant sought to hold Plaintiff accountable for such fees. Defendant's September 1, 1998 motion states that it supplements the July 17, 1998 motion.

1998. After carefully considering the motions, briefing, supporting evidentiary submissions, and applicable law, the Court GRANTS IN PART and DENIES IN PART these motions. The Court modifies the requested sanction as to Plaintiff's counsel to craft the least sanction available to deter like conduct in the future as required by the law of this Circuit.

## BACKGROUND

This case was brought pursuant to the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* Plaintiff J. Scott Seawright ("Seawright") was employed by Defendant Charter Furniture Rental, Inc. ("Charter") as an account manager from November 1986 until his termination on September 11, 1995. Charter is in the furniture rental and sales business. Charter is co-owned by Bill Crepeau, who serves as Charter's Chief Executive Officer; Mike Crepeau, who serves as its President; and Jayne Crepeau, who serves as its Corporate Secretary. John Gannon ("Gannon") is the Vice–President of Charter's rental division, and was Seawright's immediate supervisor during his employment with Charter.

As an account manager, Seawright's job responsibilities included recruiting new accounts; leasing furniture to various businesses for use in apartments, corporate houses, and offices; following up on customer questions, complaints, and concerns; setting up demonstrations of Charter products; processing orders; and making sure the customers were satisfied. Account managers are also scheduled for "showroom duty" from 9:00 a.m. to 1:00 p.m. or 1:00 p.m. to 6:00 p.m. Seawright was an at-will employee who could be discharged at any time, with or without cause.

In 1985, Seawright began living with and having a homosexual relationship with John Hull ("Hull"). Seawright made every effort to conceal his true relationship with Hull from Charter management and employees, telling them Hull was merely his roommate. At one point, Seawright told his supervisor Gannon that he had a girlfriend whom he had helped to get an abortion.

On January 9, 1991, Hull tested positive for the Human Immunodeficiency Virus ("HIV"). In the fall of 1993, Seawright told several Charter employees, including Gannon and Jayne Crepeau, that Hull had colon cancer. Seawright knew that Hull did not in fact have cancer, but had Auto-immune Deficiency Syndrome ("AIDS"). By January 1995, Hull was unable to work, had numerous medical problems, had difficulty eating and was on an IV, was bedridden and incontinent, and required home health care when Seawright was not at home. Seawright was Hull's primary health care giver, with the responsibility for giving Hull up to 368 injections per week; clearing the lines of the subclavian triple lumen, through which Hull received medication; maintaining the integrity of the IV lines; and changing Hull's clothes and bed sheets. Seawright eventually confided in two co-workers who were not part of Charter management, Treva Burns ("Burns") and Jenny Hughey ("Hughey"), that Hull had AIDS rather than cancer, and asked them not to tell anyone else.[2] Neither Burns nor Hughey ever told anyone with Charter management that Hull was HIV-positive or had AIDS.[3]

During his employment with Charter, Seawright received various warnings related to deficiencies in his job performance. Seawright's sales activity was down, his customers were calling because their furniture was not being delivered, and leases were sitting on Seawright's desk instead of being put into the system for delivery.[4]

---

**2.** Deposition of Scott Seawright on February 27, 1998 at 71–73.

**3.** Affidavit of Treva Burns at 1; Affidavit of Jenny Hughey at 1.

**4.** Deposition of Bill Crepeau on June 8, 1998 at 33–34.

Seawright also did not fulfill commitments to customers.[5]

On June 6, 1995, Mike Crepeau and Gannon counseled Seawright about his job performance. Seawright was given a written disciplinary warning which noted that during the past 30 days, he had missed several appointed showroom shifts, been up to an hour late for every appointed showroom shift, and failed to schedule customer orders in a timely manner. This warning, which Seawright signed, noted that he had previously been verbally warned about these problems, and concluded with the admonition that "if these problems are not corrected, your employment at Charter Furniture will be terminated."

In July 1995, Hull was transferred to Lubbock, where his parents lived, to receive hospice care. Seawright was therefore no longer Hull's primary health care giver. On July 18, 1995, Seawright told Charter that Hull had died, and Seawright asked for and received vacation time to attend Hull's funeral. Hull in fact had not died, but Seawright wanted to spend time with Hull while he was still alive.

When Seawright returned to work on July 25, 1995, Gannon, Mike Crepeau, and Bill Crepeau met again with Seawright to discuss with him additional performance problems they had noted since their meeting the month before. They acknowledged the personal problems that Seawright had had regarding Hull's medical condition, offered their condolences regarding Hull's "death," and told Seawright he would have one last opportunity to correct these performance deficiencies prior to being discharged. Complaints from customers and Charter's warehouse staff about Seawright did not improve after this July meeting.[6] On August 17, 1995, Hull passed away at his parents' home in Lubbock as a result of complications from AIDS. No one at Charter knew this because Seawright had told them that Hull had died in July. On August 22, 1995, Bill Crepeau gave Seawright a corrective interview regarding sales. No written reprimand was issued at this meeting.[7]

Charter terminated Seawright's employment on September 11, 1995. This was a joint decision by Bill Crepeau, Mike Crepeau, and Gannon.[8] According to Gannon, that morning, after their regular Monday sales meeting, he specifically instructed Seawright to obtain signed lease documents and finalize arrangements on a large multi-lease transaction with Waterford Court. When Gannon learned later that day that the leases were not signed and Seawright had not been to Waterford Court, he questioned Seawright about it. Seawright told him that he had spent the morning with another client, a law office. Gannon called the law office and learned that Seawright had not in fact been there.[9] Gannon met with Mike Crepeau and Bill Crepeau, and they jointly made the decision to discharge Seawright because of his insubordination (failure to follow Gannon's instructions to obtain signed lease documents at Waterford Court), Seawright's untruthfulness when questioned, and his repeated failure to correct performance deficiencies, despite previous warnings that his failure to correct the deficiencies would result in his discharge. Jayne Crepeau was not involved in the decision to terminate Seawright, and she did not learn about it until afterwards.

5. Deposition of Mike Crepeau on June 3, 1998 at 22.

6. Bill Crepeau depo. at 35–36.

7. Plaintiff's Objections and Responses to Defendant's First Interrogatories at 18.

8. Mike Crepeau depo. at 36–37.

9. Deposition of John Gannon on June 8, 1998 at 37–43. The woman at the law office whom Gannon identified as the person to whom he spoke, Carolyn Roberts, does not recall speaking with Gannon on that day. Declaration of Carolyn Roberts in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment at 1.

According to Seawright, after the Monday sales meeting, he suggested that he should go to Waterford Court to get the leases signed, and Gannon agreed with his suggestion. When he went there, the person he needed to see was out, so he made calls at other companies. He went to an attorney's office in Mesquite, Texas. While he was there, he received a page from Gannon. Seawright told Gannon he didn't have the signed leases yet because the person had been out, and he returned to Waterford Court in the early afternoon. Seawright called Gannon again from Waterford Court, reporting that he had the signed leases. Gannon instructed him to return to the showroom. When Seawright returned, Gannon told him that he was terminated, and they had a small conversation. Seawright gave Gannon the signed Waterford Court leases. Gannon had already prepared a form that stated Seawright was being terminated for poor performance and insubordination.[10]

On December 28, 1995, Seawright filed a charge of discrimination with the Texas Commission on Human Rights ("TCHR"), which forwarded it to the Equal Employment Opportunity Commission ("EEOC") for dual filing. Seawright's amended TCHR charge of discrimination, filed in March 1996, alleges that Charter discriminated against him in violation of the Texas Commission on Human Rights Act ("TCHRA") and the ADA because he was the roommate and primary health care giver to an individual who had died of AIDS and that Charter's owners were aware that Seawright had a close association with an individual with AIDS. On May 14, 1997, the TCHR notified Seawright and Charter that it had investigated the discrimination charge, and the evidence indicated that there was no reasonable basis to believe that there had been a violation of the TCHR. On June 20, 1997, the EEOC sent Seawright a right to sue notice. Seawright timely filed this lawsuit on September 24, 1997.

Seawright asserted that his termination was discrimination, in violation of the ADA. Specifically, Seawright contended that Charter discriminated against him in the terms, conditions, and privileges of his employment because of his being regarded as having a disability (AIDS or the possibility of AIDS), in violation of the ADA. Seawright also contended that Charter discriminated against him in the terms, conditions, and privileges of his employment because of his association with a person with a disability or a person being regarded as having a disability in violation of the ADA. Such discrimination included subjecting Seawright to a less favorable working environment, targeting him for termination, and terminating his employment on September 11, 1995.

Both of these ADA claims turned on Seawright's relationship with Hull. Seawright claimed that Charter knew he was Hull's primary health care giver and that Charter knew Hull had AIDS, not cancer. As a person with AIDS, Hull was a person with a disability under the ADA. Seawright was, therefore, a person associated with a person with a disability under the ADA. And, because of Seawright's homosexual relationship with Hull, Seawright claimed Charter knew it and that Charter also regarded Seawright as having a disability (AIDS or the possibility of AIDS).

## SUMMARY JUDGMENT

By Memorandum Opinion and Order filed July 9, 1998, the Court granted summary judgment in favor of Charter on Seawright's ADA claims. Seawright failed to raise a genuine issue of material fact that his termination was linked to Hull's AIDS. Thus, Seawright failed to satisfy the first element of a prima facie case of ADA discrimination, that he was regarded by Charter as having a disability. Seawright also failed to satisfy the third element of a prima facie case of association discrimination, that he was *known* by Charter at the

---

10. Seawright depo. at 105–112.

time of his termination to have a relative or associate with a disability. Setting aside the fact that *at the time of Seawright's termination* he did not have a relative or associate with a disability because Hull had died, Seawright could not satisfy the requirement that Charter knew that Hull had AIDS and not cancer.

Seawright asserted that Charter knew the truth about Hull's actual illness because he had told another salesperson (Burns) and a support staffer (Hughey) that Hull was HIV-positive or had AIDS prior to Hull's death. Seawright had discussed the drugs Hull was taking and his condition with Jayne Crepeau (a registered nurse by training), which led him to believe that she knew Hull was HIV-positive or had AIDS. Also, one afternoon, Seawright was talking with another salesperson, Ray Morris, who had seen a billboard relating to AIDS. Morris asked Seawright if that was what his roommate was dying of. Seawright would neither confirm nor deny it, and Seawright asked Morris where he had heard that. Morris replied that he didn't know, but he just thought he had heard that.[11] Jayne Crepeau had also been part of this conversation. Finally, Seawright asserted that Charter knew about Hull's true condition because it's a family-owned business where there's a lot of "talk" about everything.

Bill Crepeau testified by affidavit that prior to Seawright's discharge, he did not know that Hull had AIDS or was HIV-positive or had died of AIDS. He did not know that Seawright and Hull had had a sexual relationship, and he did not believe Seawright had AIDS or was HIV-positive. Mike Crepeau testified by affidavit that prior to Seawright's discharge, he did not know that Hull had AIDS or was HIV-positive or had died of AIDS. He did not know that Seawright and Hull had had a sexual relationship, and he did not believe Seawright had AIDS or was HIV-positive.

Jayne Crepeau testified by affidavit that prior to Seawright's discharge, she did not know that Hull had AIDS or was HIV-positive or had died of AIDS. It was her understanding directly from Seawright that Hull had died from colon cancer. She did not know that Seawright and Hull had had a sexual relationship, and she did not believe Seawright had AIDS or was HIV-positive. Any discussions she had with Seawright pertaining to Hull's medications were not specific to AIDS but were general to pain relief and nutrition, and they were consistent with her belief that Hull had cancer. Seawright confirmed that she never asked him whether Hull was HIV-positive or had AIDS, nor did she comment that the treatment or drugs administered to Hull were typical for AIDS patients.[12]

When asked in his deposition whether he ever told anyone at Charter that he had a sexual relationship with Hull, Seawright replied, "Absolutely not."[13] Seawright never told anyone at Charter that he had a special relationship with Hull other than just being roommates.[14] Seawright confirmed that he had told people at Charter that he had a girlfriend, when in fact he did not, and that he had told Gannon he had helped her obtain an abortion.[15] Seawright testified that he had never told the Crepeaus or Gannon that Hull had AIDS or was HIV-positive.[16] Seawright told Jayne Crepeau, Gannon, and other Charter employees that Hull had colon cancer when he knew that was not true.[17] Seawright had no personal knowledge that anyone ever told the Crepeaus or Gannon

11. Morris does not recall having such a conversation with Seawright. Deposition of Ray Morris on June 3, 1998 at 14.

12. Seawright depo. at 83.

13. Seawright depo. at 66.

14. Seawright depo. at 65, 142.

15. Seawright depo. at 66, 142–43.

16. Seawright depo. at 67–68.

17. Seawright depo. at 68.

that Hull was HIV-positive or had AIDS or had died from AIDS prior to Seawright's termination from Charter.[18] No one ever told Seawright that they had told the Crepeaus or Gannon that Hull was HIV-positive or had AIDS prior to Seawright's termination.[19]

The competent summary judgment evidence (contrasted with Seawright's mere speculation and conjecture) demonstrated that Charter management believed Seawright's own declarations that he and Hull were merely roommates and that Hull died of cancer, not AIDS. The crux of the case was not whether AIDS is a disability under the ADA with respect to Hull (the Supreme Court had recently confirmed that it is), but whether Charter *knew* or *believed* that Hull had AIDS *and* terminated Seawright as a result. Seawright did not attempt to assert that Charter regarded him as having a disability because it believed Hull had cancer; certainly Charter wouldn't have suspected that Seawright would somehow get cancer by taking care of Hull. Because Seawright failed to raise a genuine, material fact issue that Charter regarded him as having a disability, the Court granted summary judgment in favor of Charter on his ADA discrimination claim.

Likewise, Seawright's association discrimination claim failed because Seawright could not establish a causal connection between his termination and Hull's disability. Even if Seawright had demonstrated that Charter believed that Hull had AIDS, which he did not, Seawright failed to demonstrate that his termination had anything to do with Hull's medical condition. Seawright was counseled about his poor work performance on three separate occasions prior to his termination. The Court also granted summary judgment in favor of

Charter on his association discrimination claim.

## MOTIONS FOR ATTORNEYS' FEES

Charter seeks its reasonable and necessary attorneys' fees and expenses from Seawright as the prevailing party under the ADA.[20] Charter also seeks its reasonable and necessary attorneys' fees and expenses from Seawright's counsel, alleging that she failed to perform a proper prefiling investigation as required by Rule 11 and that she continued to pursue a frivolous lawsuit.

*Attorneys' Fees as to Seawright*

The ADA provides that the Court, "in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, including litigation expenses, and costs ..." 42 U.S.C. § 12205. The standard for awarding fees to a prevailing defendant/employer is higher than for a prevailing plaintiff; a district court may in its discretion award attorneys' fees to a prevailing defendant only if the court finds that the plaintiff's claim was "frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421–22, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978); *See also Adkins v. Briggs & Stratton Corp.*, 159 F.3d 306, 307 (7th Cir. 1998); *Summers v. A. Teichert & Son, Inc.*, 127 F.3d 1150, 1154 (9th Cir.1997). The Court need not find subjective bad faith on the plaintiff's part to award fees to the prevailing defendant, but if the plaintiff is found to have brought or continued his claim in bad faith, "there will be an even stronger basis for charging him with the attorney's fees incurred by the de-

---

18. Seawright depo. at 70.

19. Seawright depo. at 141.

20. In this Court's Final Judgment, filed on July 9, 1998, this Court ordered that "[c]osts of court as calculated by the clerk of court are taxed against Plaintiff." As discussed below,

while this Court will order Seawright to pay to Charter the reasonable and necessary attorneys' fees Charter incurred in defending this case, the Court will not order Seawright to pay additional expenses or costs that are not taxable as costs by the clerk of the court.

fense." *Christiansburg Garment Co.*, 434 U.S. at 422, 98 S.Ct. 694.

■ The Court concludes that Seawright knew at the time he filed his lawsuit that his claims were frivolous, unreasonable, and groundless, and also concludes that Seawright brought this suit in bad faith. Specifically, Seawright knew when he brought this lawsuit that he had lied to Charter about his true relationship with his roommate Hull, about Hull having HIV, about Hull dying of cancer and not AIDS, and about the date of Hull's death. Seawright also knew when he brought this lawsuit that he had no personal knowledge that anyone in Charter management knew the truth concerning any of the matters about which he had consistently lied. The summary judgment evidence demonstrated that Charter dealt with Seawright in good faith, while Seawright spun a web of lies and then filed suit contending that Charter couldn't have actually believed those lies.[21]

Finally, Seawright knew when he brought this lawsuit that he had had several disciplinary meetings with Charter management prior to being discharged. In the months just prior to Seawright's termination, his sales were down, his customers were not getting their furniture delivered on time, leases were sitting on his desk unprocessed, he was missing showroom shifts, and he was coming in late for the shifts he did work.[22] Seawright had been warned verbally and in writing about his performance problems and had been admonished that his employment would be terminated if the problems were not corrected.

Charter repeatedly cautioned Seawright that if he continued to pursue this action, Charter would seek its attorneys' fees. Charter is a small, family-owned business, and the defense costs it was forced to incur are substantial. Regardless of whether Seawright pursued this frivolous, groundless, and unreasonable lawsuit because of some vendetta against his former employer or as merely a shakedown to extract a settlement, the Court concludes that he initiated and then continued to pursue this lawsuit in bad faith.[23] *See Schutts v. Bentley Nevada Corp.*, 966 F.Supp. 1549, 1557 (D.Nev.1997). This determination was made according to the standard Seawright requested, that the Court "should not look at the results, but rather examine the reasonableness of the Plaintiff's claims going into the lawsuit."[24] The Court hereby GRANTS Charter's motion for attorneys' fees, and pursuant to 42 U.S.C. § 12205, the Court ORDERS Seawright to pay the sum of $29,809.00 to prevailing party Charter for the reasonable and necessary attorneys' fees Charter incurred in defending this case.

21. Seawright denies any improper motive in bringing the lawsuit by arguing: "To maintain a lawsuit against Charter, Mr. Seawright was forced to reveal the extent of his relationship with his roommate. This revelation was extremely difficult for him and required a complete conviction to his belief that he had been discriminated against." Plaintiff's Response to Defendant's Rule 11 Motion at 7. Yet Seawright alleged in his lawsuit that everyone at Charter (a small office) already knew the truth about his relationship with Hull, which he claimed led to Charter's discrimination against him in violation of the ADA.

22. In his response, Seawright acknowledges that his sales numbers were "slipping," but argues that they were still at or above the level of his co-workers. Seawright repeatedly attempts to persuade the Court to focus solely on sales numbers. This is not surprising, as Seawright apparently doesn't dispute these other serious performance deficiencies. Plaintiff's Response to Defendant's Motion for Attorneys' Fees and Expenses at 10.

23. Under the heading of "no good deed goes unpunished," Seawright argues that because Charter didn't choose to fight Seawright's eligibility for unemployment benefits, "it was reasonable for [Seawright] to believe that reasons other than the stated reasons may have motivated his termination." Plaintiff's Response to Defendant's Motion for Attorneys' Fees and Expenses at 11.

24. Plaintiff's Response to Defendant's Motion for Attorneys' Fees and Expenses at 3.

*Attorneys' Fees as to Seawright's Counsel*

Charter asserts that Seawright's counsel, Janette Johnson[25], failed to conduct a proper pre-filing investigation as required by Rule 11(b), which would have revealed that the allegations and other factual contentions Johnson set forth in Seawright's Complaint had no evidentiary support and were unlikely to have evidentiary support after a reasonable opportunity for further investigation and discovery. Charter contends that had Johnson conducted a proper pre-filing investigation, she would have realized the truth of what Charter management and counsel stressed at the Rule 26(f) meeting held shortly after she filed suit: that Charter had legitimate, nondiscriminatory reasons for discharging Seawright and that because of Seawright's lies to Charter, Charter had no knowledge of Seawright's true relationship with Hull or the real cause of Hull's death. Charter submits that after Johnson compelled Charter to incur more than $30,000 in attorney's fees and expenses in defending this lawsuit, she did not obtain any new evidence different from what was learned at the Rule 26(f) meeting and what she should have learned in a pre-filing investigation.

■ Rule 11(b) of the Federal Rules of Civil Procedure provides that by presenting to the court a pleading, motion, or other paper, an attorney is certifying that to the best of his knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.[26]

"[T]he central purpose of Rule 11 is to deter baseless filings in district court and thus ... streamline the administration and procedure of the federal courts." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). To achieve this purpose, Rule 11 provides "a means by which litigants certify to the court, by signature, that any papers filed are well founded." *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 533, 542, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991). In the Fifth Circuit, a district court must apply the "snapshot" rule: sanctions under Rule 11 may not be imposed "merely for the eventual failure of a claim; rather, sanctions are to be applied only where, *at the time of the filing*, the position advocated is unwarranted." *Matta v. May*, 118 F.3d 410, 415 (5th Cir.1997) (emphasis added).

■ In determining whether an attorney has made a reasonable inquiry into the law, the Court may consider: "the time available to the attorney to prepare the document; the plausibility of the legal view contained in the document; the pro se status of the litigant; and the complexity of the legal and factual issues raised." *Thomas v. Capital Security Services, Inc.*, 836 F.2d 866, 875–76 (5th Cir.1988) (en banc). The determination of whether an

**25.** Seawright was represented in this case by Janette Johnson and Kurt C. Banowsky from the firm Janette Johnson & Associates.

**26.** Fed.R.Civ.P. 11(b).

attorney has made a reasonable inquiry into the facts of the case depends, of course, on the particular facts, but the Court may consider such factors as:

> the time available to the signer for investigation; the extent of the attorney's reliance upon his client for the factual support for the document; the feasibility of a prefiling investigation; whether the signing attorney accepted the case from another member of the bar or a forwarding attorney; the complexity of the factual and legal issues; and the extent to which development of the factual circumstances underlying the claim requires discovery.

*Thomas,* 836 F.2d at 875. An attorney who has filed court papers with no basis in fact needs no more notice of her Rule 11 violation than the existence of Rule 11 itself. *Merriman v. Security Ins. Co. of Hartford,* 100 F.3d 1187, 1191 (5th Cir. 1996).

▆▆▆ When Rule 11 has been violated, the Court must "carefully choose sanctions that foster the appropriate purpose of the rule, depending upon the parties, the violation, and the nature of the case." *Thomas,* 836 F.2d at 877. The sanction imposed should be the least severe sanction that would adequately deter an attorney from violating the rule. *See Id.* at 878; *Merriman,* 100 F.3d at 1194. Appropriate sanctions might include monetary sanctions, admonishment or a reprimand, or requiring some form of legal education. *See Thomas,* 836 F.2d at 877–78. When warranted for effective deterrence, the sanctions imposed for violations of Rule 11 may include an order directing payment to the movant of some or all of the reasonable attorney's fees and other expenses incurred as a direct result of the violation. *See Merriman,* 100 F.3d at 1194–95; Fed. R.Civ.P. 11(c)(2).

The chronology of events in this case is as follows:

| Date | Event |
| --- | --- |
| 9/11/95 | Seawright's employment with Charter is terminated. |
| 7/4/96 | Seawright's previous lawyer, Catherine Kneeland, sends a demand letter to Charter's lawyer. |
| 7/15/96 | Charter's lawyer responds—Kneeland is told Seawright was terminated for performance problems: "Your claim that Mr. Seawright was discharged because of a perception by Charter Furniture that he was HIV positive is wholly untrue, false, and groundless." Kneeland is invited to review Seawright's employment file. The letter also cautions, "Please be advised that you will be held to the standards of Rule 11 ... Reasonable inquiry should clearly indicate that the allegations made by Mr. Seawright have absolutely no evidentiary support." Janette Johnson acknowledges she saw this letter before she filed suit. |
| 6/26/97 | Seawright receives his right-to-sue notice letter from the EEOC (90–day deadline to file suit). |
| 9/12/97 | With 12 days left to sue, Seawright contacts attorney Janette Johnson about representation. |
| 9/24/97 | Johnson files suit. |
| 11/97 | Rule 26(f) conference—Charter's lawyer and Charter's management tell Seawright and his counsel in no uncertain terms the lawsuit is groundless and they will seek attorney's fees and expenses from both Seawright and his counsel. |
| 11/18/97 | Parties file Joint Status Report—Charter reiterates its belief that the lawsuit is groundless, frivolous, and intended solely for harassment, and outlines Seawright's performance problems, stating, "Defendant invited Plaintiff's counsel to review the employment file prior to filing the lawsuit, but Plaintiff's counsel ignored such invitation and filed the Complaint. Accordingly, Defendant will be seeking recovery of its attorneys fees and expenses in this lawsuit." |

| | |
|---|---|
| 5/7/98 | Charter files its motion for summary judgment. Charter asks for its attorneys' fees, expenses and costs from Seawright and Johnson pursuant to the ADA section awarding attorneys' fees to the prevailing party and Rule 11. |
| 7/9/98 | The Court issues its Memorandum Opinion and Order dismissing the case. |
| 7/17/98 | Charter files a motion for award of attorneys' fees against Seawright and Johnson. |
| 8/17/98 | Seawright, proceeding *pro se*, files a notice of appeal. |
| 9/1/98 | Charter files a separate motion for attorneys' fees against Johnson. |
| 10/6/98 | The Fifth Circuit dismisses Seawright's appeal as untimely filed. |

Johnson acknowledges that she did not review Seawright's employment file with Charter or contact Charter for its reasons for Seawright's termination before she filed suit. Seawright first contacted Johnson's firm on September 12, 1997, which was 12 days before his time limit to sue in federal court would have expired. A week later, Seawright came into Johnson's offices for further consultation with attorney Kurt Banowsky that lasted more than two hours.[27] Seawright also met with Johnson that day.

Seawright presented Johnson and Banowsky with his sales figures; letters of commendation; various written versions of Seawright's claims; other documents not even tangentially relevant to the core issue of Charter's knowledge of the truth about Seawright and Hull; a tape recording of a conversation between Seawright and another Charter employee, "wherein the employee seems to indicate knowledge on the part of Charter of Mr. Seawright's roommate's AIDS status;"[28] a tape recording of a disciplinary meeting Charter management had with Seawright; and the letter from Charter's counsel cautioning that Seawright's allegations had no evidentiary support. Although Seawright admits that he lied to Charter time after time after time about Hull, his illness, and their relationship, Johnson submits that "[a]t no point prior to or after filing the lawsuit did the law firm have any reason to doubt that Mr. Seawright was not being truthful with the law firm or that he would not be truthful in the ensuing litigation."[29]

 Johnson argues that "at the outset, it was reasonable to believe that other issues, such at [sic] the Defendant's knowledge of Mr. Seawright's roommate's illness, would have been developed favorably to Plaintiff through discovery."[30] This is simply not true. Charter's counsel notified Seawright's former counsel in July 1996, thirteen months before Johnson filed suit, that Seawright's perception that he was fired because Charter thought he was HIV-positive was utterly groundless. Charter never wavered from that position, and Charter told Seawright and Johnson again and again and again that its management had no knowledge of Seawright's true relationship with Hull, had no knowledge that Hull died of AIDS, and had believed in good faith Seawright's elaborate deception about the situation. Cutting through Johnson's self-serving justification of her pre-filing "investigation," Johnson clearly filed this lawsuit based on nothing more than her client's speculation

---

27. For example, Banowsky and Seawright discussed "Plaintiff's belief that the timing of his termination was suspicious. Mr. Seawright informed me that he was terminated the first day after the owners of Charter had been on vacation. Mr. Seawright explained that given the length of his career at Charter, he felt as if the owners discussed his situation during the vacation and the decision was made to terminate his employment." Affidavit of Kurt C. Banowsky at 8.

28. Affidavit of Janette Johnson at 5.

29. Plaintiff's Response to Defendant's Rule 11 Motion at 17.

30. Plaintiff's Response to Defendant's Rule 11 Motion at 9.

and their presumption that there is a lot of "talk" in a small office.

■ The Court must address four factors in its imposition of sanctions under Rule 11. *See Topalian v. Ehrman*, 3 F.3d 931, 936–37 (5th Cir.1993). First, the "court must announce the sanctionable conduct giving rise to its order." *Id.* at 937. In this case, this Rule 11 sanction is imposed for the reasons articulated at length above. Johnson violated Rule 11(b)(3) by asserting allegations and other factual contentions (not pled on information and belief) that had absolutely no evidentiary support whatsoever. Seawright acknowledged in his deposition that he had no personal knowledge that anyone ever told Charter management that Hull was HIV-positive or had AIDS or had died from AIDS prior to his termination.[31] The Court finds that Johnson's pre-filing factual investigation was wholly inadequate in this case. *See Forbes v. Merrill Lynch, Fenner & Smith, Inc.*, 179 F.R.D. 107, 110 (S.D.N.Y.1998) (Rule 11 sanctions imposed in ADA case where attorney did not reasonably investigate whether, when, and under what circumstances plaintiff informed his employer he had AIDS, which was a crucial admission given that the employer's notice was the "crux of the case").

The second factor to be addressed is the connection between the amount of monetary sanctions the Court imposes and Johnson's sanctionable conduct. As discussed above, Johnson filed and continued to prosecute a meritless lawsuit on the basis of nothing more substantial than her client Seawright's suspicions that Charter didn't believe his consistent lies. Every dollar of attorneys' fees expended by Defendant Charter was a dollar wasted.[32]

■ With the third factor, the Court must review whether the costs or expenses were "reasonable," as opposed to self-imposed, mitigable, or the result of delay in seeking court intervention. The Court's review of the affidavits in support of Charter's requests for attorneys' fees shows the fees to be eminently reasonable. Charter alerted Johnson in its very first contacts with her that she had filed unfounded, factually baseless claims, and it repeatedly put Johnson on notice that it would seek its attorneys' fees for having to defend this frivolous lawsuit. The amount of attorneys' fees incurred in this case increased due to Johnson's stubborn refusal to acknowledge the futility of the claims. The Court can perceive no actions taken unnecessarily by Charter in the defense of the lawsuit.

Considering the *"Johnson* factors"[33] that must be applied by district courts in the Fifth Circuit, lead counsel for Charter, Kelly Crawford, is an experienced, able practitioner who specializes in the area of commercial litigation, including employment disputes. Crawford was also assisted by associates Annabel Hoffman (a former law clerk to the Honorable Jorge Solis) and Rebecca Price. The Court found the quality of their written work product to be excellent. Their rates of $160 per hour for Crawford, $130 per hour for Hoffman and Price, and $80 per hour for paralegal time certainly comport with the going rate for attorneys in this district and division with their qualifications and experience. In fact, the hourly rates are on the low side. The Court also concludes that the amount of time Crawford and his colleagues expended in defending this lawsuit was reasonable and necessary. Crawford's efforts on his client's behalf were successful, as he ob-

**31.** Seawright depo. at 70.

**32.** Johnson's arguments as to why she shouldn't be sanctioned include "we're plaintiffs' lawyers, we're the good guys," and "I can't possibly afford to pay Charter's attorney's fees." Neither consideration is relevant in the determination of whether Johnson violated Rule 11. Furthermore, such arguments are not relevant as to what the appropriate sanction for a Rule 11 violation should be.

**33.** *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974).

tained a victory on the merits. Johnson has not objected to opposing counsel's hourly rates or their calculations of the time they expended in defending this lawsuit.

Lastly, the Court must consider whether the sanction imposed is the least severe sanction adequate to achieve the purpose of Rule 11. Johnson filed and prosecuted a groundless lawsuit and forced the opposing party to needlessly incur a substantial sum in attorneys' fees to defend itself. Johnson had many opportunities throughout this case to retreat from her factually unsupported, groundless assertions. Instead of acknowledging the truth, she protracted the litigation until the Court granted summary judgment in favor of the Defendant. Johnson cannot claim that inexperience contributed to her conduct; she has been admitted to practice in the Northern District of Texas since 1989. Indeed, Johnson is board certified in labor and employment law, and she is a prominent member of the employment law bar in Dallas.

■ After carefully considering other available sanctions, the Court concludes that a monetary sanction that requires Johnson to "fix what she broke" would be fair and just. However, applying the binding law of this Circuit, the Court concludes that a monetary sanction is not the least severe sanction adequate to deter Janette Johnson from such conduct in the future.

To the Court's knowledge, Janette Johnson has not been sanctioned for a violation of Rule 11 before. Therefore, the Court concludes and holds that a published reprimand coupled with a strong admonishment and warning to not engage in the future in the conduct chronicled above is the least severe sanction that is likely to deter Ms. Johnson from such conduct in the future.

■ A court may not impose Rule 11 sanctions "merely for the eventual failure of factual and legal arguments after a trial; sanctions are to be applied only where, at the time of filing, such arguments were unwarranted." *FDIC v. Calhoun*, 34 F.3d 1291, 1300 (5th Cir.1994). Such is the case here. The Court specifically finds that

Johnson violated Rule 11 in the filing and prosecution of this frivolous lawsuit. Upon careful review of the documents filed in this case, the Court concludes that this lawsuit was frivolous, groundless, and filed in bad faith. The Court hereby publicly reprimands Janette Johnson for violation of Rule 11 in this case and admonishes her that any such conduct in the future will be more severely sanctioned.

## CONCLUSION

For the reasons discussed above, Defendant's Motion for Award of Attorneys' Fees and Expenses is GRANTED as to Plaintiff J. Scott Seawright, as set forth above. Defendant's Motion to Recover Attorneys' Fees and Expenses From Plaintiff's Counsel is DENIED. Plaintiff's counsel, Janette Johnson, is publicly reprimanded and admonished as set forth above. Within 30 days of the date of this Order, Plaintiff J. Scott Seawright is ORDERED to pay the sum of $29,809.00 to Defendant Charter Furniture Rental, Inc., as the reasonable and necessary attorneys' fees Charter incurred in defending this case.

SO ORDERED.